# EXHIBIT 1

**IN THE COURT FOR SEVENTEENTH JUDICIAL CIRCUIT,**
**IN AND FOR BROWARD COUNTY, FLORIDA**

MANUEL DOSANTOS VIERRA FAGUNDES,

     Plaintiff,

vs.

THE HOME DEPOT,

     Defendant,

_____/

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, MANUEL DOSANTOS VIERRA FAGUNDES, by and through the undersigned counsel, brings suit against Defendant, THE HOME DEPOT ("Home Depot" or "Defendant"), and alleges:

## PARTIES, JURISDICTION, & VENUE

1.    This is an action for injunctive relief and declaratory relief, actual damages of less than Thirty Thousand Dollars ($30,000.00), exclusive of interest, costs, and for attorney's fees and costs.

2.    Plaintiff, MANUEL DOSANTOS VIERRA FAGUNDES, is a natural person and resident of Broward County, Florida, and has standing to bring this action by virtue of being the subject of Defendant's violations of law as better described herein, which occurred in Fort Lauderdale, Florida.

3.    Defendant is a Georgia corporation with a principal place of business in Atlanta, Georgia (Fulton County), which at all times material hereto was conducting business in Florida, maintained agents for the customary transaction of business in Florida, and conducted substantial and not isolated business activity within this State.

4.      Based on the foregoing, venue is proper in the above-captioned Court, and this Court has jurisdiction over the causes of action alleged herein as a superior court processing plenary and general jurisdiction.

**FACTUAL ALLEGATIONS**

5.      On or around March, 2020 Plaintiff purchased the Product from one of Defendant's Stores, located at 1000 Northeast 4th Avenue, Fort Lauderdale, Broward County, Florida.

6.      Roundup" or the "Product" refers to all formulations of the Roundup® products sold by Home Depot, including but not limited to, Roundup Landscape Weed Preventer, Roundup Ready-To-Use Killer III with Sure Shot Wand, Roundup Ready-To-Use Weed & Grass Killer III with Comfort Wand, Roundup Ready-to-Use Weed & Grass Killer III with Pump 'N Go 2 Sprayer, Roundup Ready-To-Use Weed & Grass Killer III, Roundup Precision Gel Weed & Grass Killer, Roundup for Lawns Bug Destroyer, Roundup For Lawns Ready-to-Use, Roundup For Lawns1 Ready-to-Spray, Roundup For Lawns3 Ready-to-Spray, Roundup For Lawns2 Concentrate, Roundup for Lawns Crabgrass Destroyer1, Roundup Ready-To-Use Max Control 365 with Comfort Wand, Roundup Concentrate MAX Control 365, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Comfort Wand, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Pump 'N Go 2 Sprayer, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Trigger Sprayer, Roundup Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer, Roundup Ready-To-Use Poison Ivy Plus Tough Brush Killer with Trigger Sprayer, Roundup Ready-To-Use Poison Ivy Plus Tough Brush

Killer with Comfort Wand, Roundup Concentrate Poison Ivy Plus Tough Brush Killer, Roundup Weed & Grass Killer Concentrate Plus, Roundup For Lawns2 Concentrate, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Super Concentrate, Roundup Concentrate MAX Control 365, Roundup Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer, Roundup Concentrate Poison Ivy Plus Tough Brush Killer, Roundup Pro No Leak Pump Backpack Sprayer (4 Gallon), Roundup Pro Sprayer for Commercial Use (2 or 3 Gallon), Roundup No Leak Pump Backpack Sprayer (4 Gallon), Roundup Pro No Leak Pump Backpack Sprayer with Stainless Steel Components and Deluxe Comfort Harness (4 Gallon), Roundup Multi-Use Home and Garden Sprayer (1, 2, or 3 Gallon), or any other formulation thereof containing the active ingredient glyphosate. At the time Plaintiff purchased the Product, Defendant did not provide Plaintiff with any information regarding the carcinogenic nature of Roundup.

7.    Defendant could have provided such information by, for example, displaying it on the shelves where Roundup was sold (or, for some consumers, on the product pages online).

8.    Had Plaintiff known of the carcinogenic properties of Roundup and its links to cancer, he would not have purchased it.

9.    Plaintiff would purchase Roundup from Defendant again, but only if Defendant disclosed Roundup's links to cancer and provided information on how to avoid or mitigate exposure to Roundup's health risks.

A.    Background on Roundup's Labeling.

10.    Roundup is sold at Home Depot retail locations throughout the United

States, including Florida, and on Home Depot's website. Its labeling is not altered between manufacture and points of sale at Defendant's retail locations. An exemplar photograph of Roundup's front of the label is attached hereto as "Exhibit A."

11.    As indicated on Roundup's labeling, glyphosate is the active ingredient in Roundup. *Id.* Glyphosate is a nonselective herbicide that inhibits plant growth through interference with the production of essential aromatic amino acids. It was discovered to be an herbicide in 1970 and was first brought into the market as Roundup by Monsanto Company in 1974.

12.    In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant polyethoxylated tallow amine ("POEA"), which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

13.    Roundup's labeling provides certain warnings, such as, "Keep Out of Reach of Children" and "Caution." But the only hazard identified is that it may cause "moderate eye irritation." *See id*.

14.    Roundup's warning gives the false impression eye irritation is the only risk posed by Roundup, when in fact, glyphosate is known to have links to cancer, as discussed more fully herein.

B.    The IARC Classification of Glyphosate

15.    In 2015, the International Agency for Research on Cancer ("IARC"), part of the World Health Organization ("WHO"), was tasked with conducting and coordinating

research into glyphosate's carcinogenic properties.

16.   In March 2015, an IARC "Working Group" of 17 experts from 11 countries convened to evaluate several insecticides and herbicides, including diazinon, tetrachlorvinphos, malathion, parathion, and glyphosate. The evaluation was based on a cumulative review of all publicly available and pertinent scientific studies. Some of the studies pertained to people exposed to through their jobs, such as farmers. Others were experimental studies on cancer and cancer-related effects in experimental systems.

17.   In summer 2015, the IARC Working Group classified glyphosate as a Class 2A herbicide and concluded:

- glyphosate caused DNA and chromosomal damage in human cells and was probably carcinogenic to humans; and

- non-Hodgkin lymphoma was most associated with glyphosate exposure.

18.   These conclusions were consistent with scientific developments that had occurred in prior decades.

a.   Early Studies on Roundup's Carcinogenic Properties

19.   On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch conducted a study to evaluate the potential oncogenic (i.e., potential to cause cancer) responses on mice.

20.   The group "classified Glyphosate as a Category oncogen," meaning it is a possible human carcinogen.

21.   The findings of the Toxicology Branch were initially challenged by the EPA in 1991, which published a Memorandum entitled, "Second Peer Review of Glyphosate."

22.   The Memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).

23.   This conclusion was not unanimous and the Memorandum "emphasized however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

24.   Further studies and developments indicated glyphosate indeed posed (and still poses) a carcinogenic risk to humans.

25.   In 1996, New York State sued Monsanto Company for false and misleading advertising by touting its glyphosate-based Roundup products as, e.g., "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

26.   Monsanto resolved the lawsuit by

- agreeing to alter the advertising by removing any statements or implications the Products were biodegradable and environmentally friendly;

- paying $50,000 in costs.

27.   In 1997, Chris Clements, *et al.* published a study entitled, "Genotoxicity of Select Herbicides in *Rana catesbeiana* Tadpoles Using the Alkaline Single-Cell Gel DNA Electrophoresis (Comet) Assay."

28.   Genotoxicity refers to the property of chemical agents which cause damage to genetic information within a cell causing mutations, which may lead to cancer.  In Clements' publication, tadpoles were exposed to various herbicides, including Roundup,

for a 24-hour period. Roundup-treated tadpoles showed "significant DNA damage when compared with unexposed control animals."

29. In 1999, Lennart Hardell and Mikael Eriksson published a study entitled, "A Case–Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides," which consisted of a population-based case–control study in northern and middle Sweden encompassing 442 cases and twice as many controls was performed. Exposure data were ascertained by comprehensive questionnaires, and the questionnaires were supplemented by telephone interviews. The results indicated exposure to glyphosate and other herbicides yielded increased risks for Non-Hodgkin Lymphoma ("NHL").

30. In 2002, Julie Marc, et al. published a study entitled, "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." The study found Defendant's Roundup caused delays in the cell cycles of sea urchins. It further noted the deregulations of cell cycle checkpoints are directly linked to genomic instability, which can generate diseases and cause cancer. The findings led to the conclusion Roundup "causes changes in cell cycle regulation that may raise questions about the effect of this pesticide on human health."

31. In 2003, A. J. De Roos, et al. published a study entitled, "Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men," which "[r]eported use of several individual pesticides was associated with increased NHL incidence, including . . . glyphosate. A subanalysis of these 'potentially carcinogenic' pesticides suggested a positive trend of risk with exposure to increasing numbers."

32. In 2004, Julie Marc, et al. published another study entitled, "Glyphosate-

based pesticides affect cell cycle regulation." In that study, which tested Roundup 3plus on sea urchin eggs, determined "glyphosate-based pesticides are clearly of human health concern by inhalation in the vicinity of spraying," given the "molecular link between glyphosate and cell cycle dysregulation."  It observed, "roundup may be related to increased frequency of non-Hodgkin's lymphoma among farmers, citing the study by A. J. De Roos., et al.

33.    In 2008, Mikael Eriksson, et al. published a study entitled, "Pesticide exposure as risk factor for NHL including histopathological subgroup analysis," based on a case-control study of exposure to various pesticides as a risk factor for NHL. Eriksson's study strengthened previous associations between glyphosate and NHL.

34.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

35.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study entitled, "Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells," which examined the effects of four different Roundup formulations on human umbilical, embryonic, and placental cells—at dilution levels far below agricultural recommendations.

36.    The study found the formations caused cell death in a few hours in a cumulative manner, caused DNA damage, and found that the formulations inhibit cell respiration. In addition, it was shown the mixture of the components used as Roundup adjuvants, particularly POEA amplified the action of the glyphosate. The Roundup

adjuvants actually changed human cell permeability and increased the toxicity of glyphosate alone.

      b.   <u>Glyphosate-Based Herbicides, Including Roundup, are Banned Throughout the World</u>

37.   Following the IARC's report on glyphosate, several countries issued outright bans or restrictions on glyphosate herbicides, including Roundup.

38.   In May 2015, the Netherlands banned all non-commercial use of glyphosate.[1]

39.   In 2016, Italy adopted a law prohibiting the use of glyphosate in areas frequented by the public or by "vulnerable groups" including children and the elderly and in the pre-harvest phase in agriculture.[2]

40.   In June 2017, the Flemish banned glyphosate for individual-use.[3]

41.   In September 2018, the Czech Republic announced the ban on the blanket use of glyphosate as a weedkiller and as a drying agent, effective January 1, 2019.[4]

42.   In October 2018, the Indian state of Punjab banned the sale of glyphosate.[5]

43.   In February of 2019, the Indian state of Kerala also banned the sale, distribution and use of glyphosate.[6]

44.   In January 2019, French authorities banned the sale of Roundup following a court ruling that regulators failed to take safety concerns into account when clearing the widely used herbicide.[7]

---

[1] Arjun Wala, Why The Netherlands Just Banned Monsanto's Glyphosate-Based Herbicides, May 30, 2015.
[2] Soil Association, Italy Bans Toxic Glyphosate, Aug. 27, 2016.
[3] The Belgian Times, Flemish government approves ban on glyphosate for individuals, July 1, 2017.
[4] Czech Republic to restrict use of glyphosate weedkiller, Phys.org, Sept. 17, 2018; Czech Mate for Roundup?, Arc 2020, Feb. 14, 2019.
[5] Punjab government bans sale of herbicide, The Hindu, Oct. 24, 2018.
[6] Kerala government bans glyphosate, deadly weed killer, The News Minute, Feb. 5, 2019.
[7] Weedkiller Roundup banned in France after court ruling, France 24, Jan. 16, 2019.

45.    In April 2019, a French appeals court ruled Monsanto business was liable for the health problems of a farmer who inhaled Roundup.[8]

46.    In March 2019, Vietnam banned the import of all glyphosate-based herbicides.[9]

47.    On July 2, 2019, Austria's lower house of parliament passed a bill banning all uses of glyphosate.

48.    According to recent reports it is likely to pass Austria's upper house and is poised to become law.[10]

49.    On September 4, 2019, the German Federal Ministry for the Environment, Nature Conservation and Nuclear Safety issued a press release announcing Germany will ban the use of glyphosate by the end of 2023.

50.    Several municipalities and regions in Spain, the United Kingdom, and the United States, have also banned glyphosate herbicides.

51.    Over 20 states within the United States banned the use of glyphosate products or addressed health concerns over the use of products which contain glyphosate.

52.    The State of California Benicia County has outlawed the use of glyphosate products, as well as several other counties.

53.    The State of Florida Fish and Wildlife Conservation Commission has ceased the use of herbicides, glyphosate chief among them while the agency gathers more evidence of glyphosates harmful effects.

---

[8] Gus Trompiz and Catherin Lagrange, French Court Rules Bayer's Monsanto Weedkiller Liable for Farmer's Health Problems, Insurance Journal, Apr. 11, 2019.

[9] Vietnam Bans Import of Glyphosate Herbicides after US Cancer Trial Verdict, Sustainable Pulse, Mar. 25, 2019.

[10] Austrian parliament backs EU's first total ban of weedkiller glyphosate, Reuters, July 2, 2019.

c.  <u>Monsanto Loses Three Verdicts after Roundup is Found to Cause Cancer in Humans</u>

54.  On August 10, 2018, a unanimous California jury in Johnson v. Monsanto Co., No. CGC16550128 (Cal. Super. Ct., Cnty. of S.F.) held MONSANTO COMPANY's Roundup and Ranger Pro herbicides were unsafe and were a substantial factor in causing harm to the plaintiff.

55.  The jury also found MONSANTO COMPANY failed to adequately warn customers of the risks associated with its Roundup and stronger Ranger Pro products, and that the company acted with malice or oppression.

56.  On March 27, 2019, a unanimous California jury in Hardemon v. Monsanto Co., No. 3:16-cv-00525-VC (N.D. Cal.) found MONSANTO COMPANY liable for failing to warn Roundup could cause cancer, liable for negligence, and liable in a design defect claim.

57.  On May 13, 2019, a California jury found MONSANTO COMPANY likely caused a couple's cancer in Pilliod v. Monsanto Co., No. RG17862702 (Cal. Super. Ct., Cnty. of Alameda).

58.  The jury found on a preponderance of the evidence Roundup was a significant contributing factor in causing the plaintiff's NHL.

d.  <u>Home Depot's Failure to Warn Consumers of Roundup's Carcinogenic Properties.</u>

59.  Defendant is not involved in the manufacture and design of the Roundup products. Roundup products are instead manufactured by Monsanto Company, Bayer Corporation, and/or Bayer AG.

60.   Defendant is however responsible for selling Roundup directly to consumers and plays an integral role in placing Roundup into the stream of commerce.

61.   Customers rely on Defendant, as a significant retailer, to offer quality products from trusted brands. But instead of putting its customers' safety first and informing consumers about Roundup's potential health risks, Home Depot sold a potentially deadly product for its own direct financial benefit.

62.   Defendant was aware of the substantial danger to consumers while using Roundup in an intended and reasonably foreseeable way, however Defendant does not alert consumers of Roundup's potential health risks.

63.   Accordingly, Plaintiff and all other consumers purchasing the product at Defendant's stores throughout Florida have been, are, and will continue to be aggrieved by the Product and are being deprived of the benefit of the bargain they reasonably anticipated from the Product labeling and lack of proper warning.

64.   Plaintiff has performed all conditions precedent to bringing this Action.

## ANTICIPATED DEFENSE

65.   In anticipation of a defense that may be raised by Defendant, and only in response to that anticipated defense, Plaintiff pleads that in addition to violating Florida consumer protection laws, in the manner set forth above, the Product also failed to comply with Section 8(e) of the Toxic Substance Control Act of 1976, which requires anyone who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to human health or the environment must immediately inform the EPA of such information unless

the person has actual knowledge that the EPA has already been adequately informed of such information.  Despite the abundance of information that the product presents a substantial risk of injury to human health, a portion of which has been summarized in this Complaint, the EPA was not provided any medical records to review from the court cases resulting in large verdicts against Monsanto for causing cancer, thereby depriving this agency, which is focused on protecting human health issues, from making an informed decision as to whether glyphosate is a safe ingredient for human exposure. The failure to provide this information to the EPA violated Section 8(E) of TSCA and renders any preemption defense inapplicable.

## CAUSE OF ACTION
## COUNT I:  VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")

66.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

67.    Plaintiff was at all times material hereto an individual and thus a "consumer" as defined by Section 501.203(7), *Florida Statutes.*

68.    Defendant engaged in the marketing (including but not limited to weekly ads, mailers and PDP displays), distribution and/or sale of the Product, which contains the active ingredient glyphosate, and contains adjuvants, including POEA.

69.    Defendant was at all times materially engaged in advertising, providing, offering, and distributing by sale a tangible good, otherwise known as "trade or commerce" as defined by Section 501.203(8), *Florida Statutes.*

70.    As detailed above, Defendant's wrongful conduct includes selling, marketing, and advertising Roundup without informing consumers that it poses a cancer risk.

71.    Defendant's failure to disclose the Product's carcinogenic properties and/or its potential to cause cancer are misleading and deceptive and have an effect on the general public.

72.    Defendant, by advertising, distributing the Product that was deceptively marketed by omission of material information, engaged in unfair and deceptive acts and practices as contemplated in Section 501.204(1), *Florida Statutes.*

73.    Defendant should have been aware of the risks of the Product due to the available information, *supra*.

74.    Defendant concealed and/or failed to disclose material facts concerning the

probable carcinogenic nature of the products.

75.   Defendant is in a position to protect consumers from the risks of Roundup by simply providing a point of purchase shelf-warning, and can adjust the costs of such protection in the course of its ongoing business relationships with the makers of Roundup—Bayer and Monsanto—but has chosen not to.

76.   Furthermore, Defendant, by virtue of its position in the marketplace, can exert pressure on the makers of Roundup to include appropriate health and safety warnings on its labeling.

77.   Defendant's omissions were uniform and material and constituted a continuing course of conduct of misleading and deceptive business practices.

78.   Plaintiff did not know the products posed the risk of cancer at the time he purchased the Product. Plaintiff would not have purchased Roundup from Defendant had he known it had carcinogenic properties.

79.   Plaintiff is entitled to bring this Action for declaratory and injunctive relief or the benefit of himself and all other consumers throughout Florida who have been, are, and will be aggrieved by the Product, pursuant to Section 501.211(1), *Florida Statutes*.

80.   This Action concerns a bona fide, actual, and existing need for declaration that the Product is deceptively labeled and marketed, for the benefit of Plaintiff.

81.   Additionally, Plaintiff is entitled to bring this Action pursuant to Section 501.211(2), *Florida Statutes*, for actual damages, which amount to the purchase price of the Product, as they have paid a premium price for the Product which has been marketed, advertised, sold, and distributed.

82.   Plaintiff has and will incur reasonable costs and attorneys' fees in pursuit of

this Action.

WHEREFORE, Plaintiff respectfully requests this Court enter declaratory judgment finding Defendant violated FDUTPA; entering injunctive relief by directing Defendant to notify consumers at the point of sale (for example, through signage on store shelves and on product webpages, that the glyphosate in Roundup has been linked to cancer in humans. Such an order would enhance safety since Defendant is in an ideal position in the marketplace to warn its customers about Roundup's potential safety risks; awarding Plaintiff's actual damages, costs, and reasonable attorneys' fee pursuant to Section 501.211(2), *Florida Statutes*, and granting all other relief the Court deems just and proper.

Dated:  March 21, 2020

Respectfully submitted,

 By: /s/ Howard W. Rubinstein
Howard W. Rubinstein, Esq.
The Law Office of Howard W. Rubinstein
1281 N. Ocean Dr. Apt. 198
Singer Island, FL 33404
Telephone: 832-715-2788
Fax: 561-688-0630
Email: howardr@pdq.net

**EXHIBIT A**







